IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

STATESBORO DIVISION

CIVIL ACTION NO. CV606-89

---

NICOLAS RAMOS-BARRIENTOS,

ANSELMO HERNANDEZ-MARTINEZ,

JORGE HERNANDEZ-ANTONIO,

GREGORIO PONCE-HERNANDEZ,

CATALINO HERNANDEZ-RUBIO,

on behalf of themselves and

all other similarly situated

persons,

        Plaintiffs,

     vs.

DELBERT C. BLAND d/b/a BLAND

FARMS, BLAND FARMS, LLC,

MICHAEL BRYAN BELL, MANPOWER

OF THE AMERICAS, AND CONSULAR

SERVICES INTERNATIONAL,

        Defendants.

U. S. DISTRICT COURT
Sou........ .......ct of Ga.
        :::
        M
        20____
**Deputy Clerk**

U. S. DISTRICT COURT
Southern District of Ga.
Filed in Office
        M
        20 / 0
**Deputy Clerk**

---

30(B) DEPOSITION

OF

SARAH EURY FARRELL VOL. IV

At Pinehurst, North Carolina

January 12, 2009

2:10 p.m.

Reported by:  Cynthia L. Hall, RPR

ORIGINAL



Sarah Eury Farrell

1                     A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3              ROBERT J. WILLIS, Attorney at Law

4              LAW OFFICES OF ROBERT J. WILLIS

5              5 West Hargett Street, Suite 404

6              Raleigh, North Carolina  27601

7              P. O. Box 1269

8              Raleigh, North Carolina  27602

9    FOR THE DEFENDANT BLAND FARMS:

10             WILLIAM E. DILLARD, III, Attorney at Law

11             BRENNAN & WASDEN, LLP

12             411 East Liberty Street

13             Savannah, Georgia 31401

14             P. O. Box 8047

15             Savannah, Georgia  31412

16   FOR INTERNATIONAL LABOR MANAGEMENT CORPORATION:

17             W. R. LOFTIS, JR., Attorney at Law

18             CONSTANGY BROOKS AND SMITH, LLP

19             100 N. Cherry Street

20             Winston-Salem, North CAROLINA  27101-4016

21   ALSO PRESENT:

22             Sharon B. Spell, Bland Farms

23

24

Sarah Eury Farrell

1                T A B L E   O F   C O N T E N T S

2                  E X A M I N A T I O N S

3    EXAMINATION                                      PAGE

4    BY MR. WILLIS                                    7, 78

5    BY MR. DILLARD                                   77

6

7                     E X H I B I T S

8    PLAINTIFF'S

9    EXHIBIT    DESCRIPTION                           PAGE

10   No. 14     Company Agreement                     14

11   No. 24     Fax from Mahum                        30

12   No. 68     April 16, 2003 letter to Delbert Bland   16

13   No. 99     May 8, 2003 e-mail, Medellin to Carol    27

14   No. 100    Document                              20

15   No. 102    Typed document faxed from Patsy       34

16   No. 103    Fax from Sarah Eury to Patsy          36

17   No. 108    March 4, 2003 letter to Eury from

18              Goodman                               19

19   No. 109    Application for Alien Employment

20              Certification                         14

21   No. 110    Worker tracking screens, 2002,

22              60 workers                            8

23   No. 111    Worker tracking screens, 2003,

24              104 workers                           8

Court Reporting Services
919-832-4114

Sarah Eury Farrell

| | | |
|---|---|---|
| 1 | PLAINTIFF'S | |
| 2 | EXHIBIT   DESCRIPTION | PAGE |
| 3 | No. 112   Employment and Training | |
| 4 |          Administration document | 15 |
| 5 | No. 113   Group of letters | 8 |
| 6 | No. 114   Company Agreement | 8 |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

Sarah Eury Farrell

1           S T I P U L A T I O N S

2           It is hereby stipulated and agreed between

3   the parties to this action, through their respective

4   counsel of record:

5           1.  The deposition of SARAH EURY FARRELL may

6   be taken on January, 12, 2009, beginning at 2:10 p.m.,

7   at the Comfort Inn Hotel, located at 9801 U.S. Highway

8   15/501, Pinehurst, North Carolina, before Cynthia L.

9   Hall, Notary Public.

10          2.  Said deposition shall be taken for the

11  purpose of discovery or for use as evidence in this

12  above-entitled action or for both purposes.

13          3.  Any objections of any party hereto as to

14  notice of the taking of said deposition, or as to the

15  time or place thereof or as to the competency of the

16  person before whom the same shall be taken are deemed

17  to have been met.

18          4.  Objections to questions and motions to

19  stricken answers need not be made during the taking of

20  this deposition but may be made for the first time

21  during the progress of the trial of this case, or at

22  any pretrial hearing held before any judge for the

23  purpose of ruling thereon, or at any other hearing of

24  said case at which said deposition might be used,

Sarah Eury Farrell

1   except that an objection as to the form of a question

2   must be made at the time such question is asked or

3   objection is waived as to the form of the question.

4          5.   That the original of this deposition will

5   be mailed First Class postage to the appropriate party.

6   Notice of filing is hereby waived.

7          6.   That the deponent reserves the right to

8   read and sign the deposition transcript.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Sarah Eury Farrell

```
1              P R O C E E D I N G S

2    SARAH EURY FARRELL, having been duly sworn, was

3    examined and testified as follows:

4    EXAMINATION BY MR. WILLIS

5    Q   Would you state your full name for the record,

6        please.

7    A   Sarah Eury Farrell.

8    Q   And you're the person who's been designated to

9        testify on behalf of I.L.M.C. for all areas that

10       Mr. Lee Wicker did not cover --

11   A   Yes, I am.

12   Q   -- in Plaintiff's Exhibit 106, which the court

13       reporter still has.  Correct?

14   A   Yes.

15   Q   And if you'll get out 107 and look at it.  And

16       you were, I don't say you, but I.L.M.C. was

17       subpoenaed to produce certain documents here

18       today, correct?

19   A   Yes, correct.

20   Q   And let me hand you what's been marked as

21       Plaintiff's Exhibit 110 and Plaintiff's Exhibit

22       111, and Plaintiff's Exhibit 113.  And

23       Plaintiff's Exhibit 114.

24
```

Sarah Eury Farrell

1              (Plaintiff's Exhibits 110, 111, 113,

2              and 114 marked.)

3         BY MR. WILLIS:

4    Q    And are these the documents that I.L.M.C. has

5         produced pursuant to the subpoena duces tecum as

6         copied in Plaintiff's Exhibit 107?

7    A    Yes, they are.

8    Q    Now, this was something your attorney covered

9         before.  There are additional documents, as I

10        understand, that are worker tracking screens of

11        the type copied in Plaintiff's Exhibit 111 and

12        110 for workers other than the 22 workers for

13        which I.L.M.C. has already produced worker

14        tracking screens in Plaintiff's Exhibit 65 and 66

15        for years 2004, 2005 and 2006, correct?

16   A    Yes, there are.

17   Q    And as I understand it, through some -- through a

18        misunderstanding, basically, those documents

19        aren't here today, but will be produced by

20        I.L.M.C. at some other mutually convenient time?

21   A    That's correct.

22   Q    And location and place, correct?

23   A    Correct.

24   Q    Now, obviously Mr. Dillard may want to

Sarah Eury Farrell

1    cross-examine you about what information is in

2    those documents, and that means you may be coming

3    back for a fifth time, but, you know, we need to

4    come to some kind of an agreement on the record I

5    think probably so we don't have the confusion.

6        MR. DILLARD:  We're talking now about worker

7    tracking records that would show whether or not

8    someone came directly from Mexico to Bland Farms

9    or was a transfer?

10       MR. WILLIS:  Right.  And the ones we have

11   today are '03 and '02.  So basically we're

12   talking about the same kind of records for '04,

13   '05, '06, with the exception of those 22 workers

14   that we already have records for that are copied

15   in Plaintiff's Exhibit 65 and 66.

16       MR. LOFTIS:  And I believe there were no

17   transfers in '06?

18       MR. WILLIS:  Yeah, at least not among those

19   22, I don't think there were.

20       THE WITNESS:  Uh-huh, yeah, right.

21       MR. WILLIS:  Or may have been some

22   transfers, I don't know.

23       THE WITNESS:  I can't remember.  Things are

24   a bit out of order, as far as, you know,

Sarah Eury Farrell

1        chronological production.

2            MR. WILLIS:  In fact, I think -- I don't

3        know.  I don't really know.

4            MR. LOFTIS:  The --

5            MR. WILLIS:  The 22, there aren't any

6        transfers?

7            MR. LOFTIS:  Just clarifying this, would the

8        worker tracking records for '04, '05 and '06, if

9        there were any transfers, would they look like

10        '03?

11            THE WITNESS:  Yes, they would.  The

12        difference from '03 is that there's going to be

13        union information on the worker tracking screen

14        for --

15            MR. WILLIS:  '05, at least?

16            THE WITNESS:  '05.

17            MR. WILLIS:  But not for '04, at least I

18        don't think that's what --

19            THE WITNESS:  I think -- I don't know when

20        that took place.

21            MR. LOFTIS:  So hopefully the -- if that's

22        the only additional piece of information today,

23        you can get a clear understanding of what the

24        worker tracking records shows, and then with

Sarah Eury Farrell

1          respect to '04, '05, '06, if there were any, it

2          would only be a question of showing who was

3          transferred?

4                  MR. DILLARD:  Uh-huh.  Yeah.

5                  MR. LOFTIS:  I guess the significance of it

6          was if they were transferred from N.C.G.A. to

7          Bland Farms, there's no issue with respect to

8          reimbursement of M.L. transportation.

9                  MR. WILLIS:  That's correct, from N.C.G.A.

10         to Bland Farms.

11                 MR. DILLARD:  Well, I think we just need to

12         get a look at all the records, and within the

13         time frames that we had all talked about.

14                 MR. WILLIS:  Well, right now here's my

15         problem.  As the plaintiffs, I have a discovery

16         deadline of this Friday.  Unless the defendants

17         are willing to, at least for purposes only of

18         this particular problem, entertain, if the

19         defendant --

20                 MR. DILLARD:  Without going back and moving

21         the Court, just we all agree to get together

22         after we have a dispute over transfer of records?

23                 MR. LOFTIS:  Since it was my fault, I'll

24         certainly agree to that.  It was my mistake.

Sarah Eury Farrell

1          MR. DILLARD:  These are the worker tracking

2     screens from which we will be able to tell

3     whether a given worker came directly from Mexico

4     to Bland, or transferred from N.C.G.A.?

5          THE WITNESS:  Correct.  These are worker

6     tracking screens that demonstrate a transfer

7     between N.C.G.A. and Bland.

8          MR. LOFTIS:  If you don't have a worker

9     tracking record for a worker, they went directly

10     to Bland.

11          MS. SPELL:  That makes sense.

12          MR. LOFTIS:  These are not all the workers?

13          MR. DILLARD:  So these were all the

14     transfers --

15          MS. SPELL:  That did not come from Bland.

16          MR. DILLARD:  Is that correct?  Are we okay

17     if we don't have -- are we okay with coming back

18     for follow-up?

19          MR. WILLIS:  Let's do that as not friends of

20     the Court, so to speak.

21          MR. DILLARD:  Certainly not enemies of the

22     Court.

23          MR. WILLIS:  No, that's for sure.  Don't

24     want to be an enemy of the Court.

Sarah Eury Farrell

1         MR. LOFTIS:  And perhaps if the records look
2    okay, you can have a stipulation and --
3         MR. DILLARD:  Be done with it.
4         MR. LOFTIS:  There are only so many books on
5    tape you can listen to.
6         MR. DILLARD:  That's true.
7         MR. WILLIS:  Okay.  I think we've got that,
8    so we'll either come back and do a full-blown
9    cross-examination on the additional records if
10   it's the defendant's position that they still
11   have questions they want to ask live, so to
12   speak, or we'll hopefully stipulate basically
13   based on what comes out today about records that
14   are already copied before us in Plaintiff's
15   Exhibits 110 and 111, correct?
16        MR. DILLARD:  Sounds good.
17        MR. LOFTIS:  Or we can go to Savannah.
18        THE WITNESS:  Lee got us there in four
19   hours.
20   BY MR. WILLIS:
21 Q   All rightee.  Let me just get a few things out of
22   the way before I get into these.
23        Plaintiff's Exhibit 14 that I believe you
24   still have in front of you, somewhere, no, I'm

Sarah Eury Farrell

```
 1          sorry, maybe you don't.  Yeah, here we go.

 2          Plaintiff's Exhibit 14.

 3                  (Plaintiff's Exhibit 14 marked.)

 4          BY MR. WILLIS:

 5     Q    In the second -- well, the second and third page

 6          it refers to a grower by the name of Carl Graham

 7          Ferrell, G-r-a-h-a-m, F-e-r-r-e-l-l, correct?

 8     A    Correct.

 9     Q    And let me hand you what's been marked as

10          Plaintiff's Exhibit 109.

11                  (Plaintiff's Exhibit 109 marked.)

12          BY MR. WILLIS:

13     Q    And direct your attention to the sixth page of

14          this exhibit.

15              MR. LOFTIS:  109?

16              MR. WILLIS:  Yes, sir.

17          BY MR. WILLIS:

18     Q    And it's got a list of employers there, I

19          believe; is that correct?

20     A    Yes.

21     Q    And one of those employers that's listed is

22          Graham Ferrell, G-r-a-h-a-m F-e-r-r-e-l-l,

23          Correct?

24     A    Yes.
```

Sarah Eury Farrell

1   Q   And there are starting and ending dates of

2       employment for H-2A workers covered by this

3       particular application for alien employment

4       certification from February 24 of '05 to December

5       10 of 2005, right?

6   A   Right.

7   Q   And he's a Christmas tree grower?

8   A   That's listed there, yes.

9   Q   And he, at that point in time, was a member of

10      the North Carolina Growers Association making

11      application for an alien employment certification

12      with the assistance of the association, correct?

13          Judging from pages 1 through 4 of the same

14      exhibit?

15  A   Yes.

16  Q   Let me hand you what's been marked as Plaintiff's

17      Exhibit 112.

18              (Plaintiff's Exhibit 112 marked.)

19      BY MR. WILLIS:

20  Q   And you'll see at the first page there the same

21      Graham Ferrell at the same address listed on page

22      6 of Plaintiff's Exhibit 109, in Newland, North

23      Carolina?

24  A   Yes.

Sarah Eury Farrell

1  Q  And if you look at the fourth page from the back

2     in Plaintiff's Exhibit 112.

3  A  Fourth from the back?

4  Q  Yes, ma'am.

5  A  Okay.

6  Q  Do you see an agency and indemnity agreement

7     between an outfit called K.T. Labor, comma, Inc.,

8     and Mr. Ferrell, correct?

9  A  Yes.

10 Q  And it's a two-page document which has

11    Mr. Ferrell's signature on it on the third page

12    from the back of the same exhibit on, dated

13    January 5th of '06, correct?

14 A  Correct.

15 Q  And there is a person whose name appears there

16    but no signature, Tish Sowards, S-o-w-a-r-d-s,

17    right?

18 A  Yes.

19 Q  And if you look at the fifth page from the back,

20    there is some letterhead that's signed again by

21    Mr., apparently by Mr. Ferrell, January 5th of

22    '06 indicating he authorizes Ms. Patricia

23    Sowards, president of K.T. Labor Corporation,

24    Inc., to do a number of things, right?

Sarah Eury Farrell

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And then there is the address of that corporation |
| 3 | | in Lexington, Kentucky at the heading -- in the |
| 4 | | heading of the letter, right? |
| 5 | A | Yes. |
| 6 | Q | And Ms. Sowards at one point was employed by |
| 7 | | I.L.M.C.; is that correct? |
| 8 | A | Yes. |
| 9 | Q | And at least one of those years that she was |
| 10 | | employed by I.L.M.C. was in 2002? |
| 11 | A | Yes. |
| 12 | Q | Now, going back to Plaintiff's Exhibit 68. |
| 13 | | (Plaintiff's Exhibit 68 marked.) |
| 14 | | BY MR. WILLIS: |
| 15 | Q | There's a letter there dated, at least on the |
| 16 | | first page in, sometime in 2003, right? |
| 17 | A | Yes. |
| 18 | Q | And it has your name on it printed at the bottom, |
| 19 | | right? |
| 20 | A | Yes, it does. |
| 21 | Q | And it refers to you being the director of |
| 22 | | I.L.M.C. and another entity, I think? |
| 23 | A | Yes. |
| 24 | Q | And what is that? |

Sarah Eury Farrell

1    A    Kentucky Tennessee Growers Association.

2    Q    And what, if anything, is the relationship

3         between Kentucky Tennessee Growers Association

4         and K.T. Labor, or Kennedy Tennessee Labor

5         Corporation, Inc.?

6    A    There's no association other than she started

7         that organization and sort of copied the name.

8    Q    And the Kentucky Tennessee Growers Association,

9         does that continue to exist?

10   A    No, it does not.

11   Q    And when did it cease to exist in terms of what

12        year, at least, sometime after 2003, I assume?

13   A    Yes.

14   Q    And did its cessation or termination have

15        anything to do with Ms. Sowards leaving the

16        employ of I.L.M.C.?

17   A    No, it did not.

18   Q    Is Ms. Sowards' operation, Kentucky Tennessee

19        Labor Corporation, Inc. a competitor of I.L.M.C.

20        at the present time?

21   A    Yes, it is.

22   Q    And has it been a competitor since its inception?

23   A    Yes, it has.

24   Q    And the date on page 1 of Plaintiff's Exhibit 14

Sarah Eury Farrell

1          is the same that Mr. Ferrell's signature appears

2          there, January 5th of '06, is the same date that

3          appears on all the documents we looked at that he

4          signed on the third page from the back and the

5          fifth page from the back in Plaintiff's Exhibit

6          112, correct?

7    A    Yes, it does.

8    Q    And the date on the letter that's copied in

9          Plaintiff's Exhibit 14, January 5th of 2006, is

10         also that same date, correct?

11   A    I'm sorry, what did you say?

12   Q    The date in the letter that's copied at page 3 of

13         Plaintiff's Exhibit 14 is also that same date,

14         January 5th, 2006, correct?

15   A    Yes, it is.

16   Q    And from your understanding of the documents

17         contained in Plaintiff's Exhibit 112 and

18         Plaintiff's Exhibit 14 at pages 2 and 3, at the

19         time that Mr. Ferrell signed the letter of

20         authorization that appears copied at page 3 of

21         Plaintiff's Exhibit 14, was K.T. Labor, Inc. and

22         Ms. Sowards his agent?

23   A    It appears that way, yes.

24   Q    Let me hand you what's been marked as Plaintiff's

Sarah Eury Farrell

1          Exhibit 108.

2                    (Plaintiff's Exhibit 108 marked.)

3     BY MR. WILLIS:

4     Q    And do you recognize this document as a copy of a

5          letter that was sent by United States Department

6          of Labor on or about March 4, 2003 to the

7          president of I.L.M.C. in connection with a

8          temporary alien and agricultural labor

9          certification for Bland Farms?

10    A    Yes.

11    Q    And at page 3 of this particular letter there's a

12         paragraph about the Fair Labor Standards Act down

13         towards the bottom of the page, correct?

14    A    Yes.

15    Q    Let me hand you what's been marked as Plaintiff's

16         Exhibit 100 for purposes of this deposition.

17                   (Plaintiff's Exhibit 100 marked.)

18    BY MR. WILLIS:

19    Q    And ask you, first of all, the person whose

20         signature appears down there at the bottom and

21         the telephone number, do you recognize, first of

22         all, the telephone number or fax number that

23         appears there?

24    A    Yes.

Sarah Eury Farrell

| | | |
|---|---|---|
| 1 | Q | And whose number is that? |
| 2 | A | That's I.L.M.C.'s telephone number, but it looks |
| 3 | | like the area code is wrong.  I don't know at |
| 4 | | which point we change from 919 to 910, but -- |
| 5 | Q | And at some point did I.L.M.C. employ a person |
| 6 | | whose first name was Carrol, C-a-r-r-o-l? |
| 7 | A | Yes. |
| 8 | Q | And what was -- is that a man or a woman? |
| 9 | A | That's a woman. |
| 10 | Q | And what was her last name? |
| 11 | A | Trantanella, T-r-a-n-t-a-n-e-l-l-a. |
| 12 | Q | And when did she start working with I.L.M.C., |
| 13 | | roughly?  Let's put it this way:  Did she start |
| 14 | | working with I.L.M.C. before you started? |
| 15 | A | No. |
| 16 | Q | And when did she stop working for I.L.M.C., |
| 17 | | roughly? |
| 18 | A | '05, but I'm not sure. |
| 19 | Q | And let me direct your attention to the third |
| 20 | | page of this particular exhibit. |
| 21 | | Do you recognize the form that appears here, |
| 22 | | not necessarily the actual contents, but the form |
| 23 | | itself? |
| 24 | A | Yes, I do. |

Sarah Eury Farrell

1   Q   And was it a form used by I.L.M.C. as part of its

2       processing of request for preferred workers?

3   A   Yes, it was.

4   Q   And this, the way the form was supposed to work,

5       the grower's number was entered by hand; is that

6       correct?

7   A   Yes.

8   Q   And that's up there in the upper left-hand corner

9       G-R with a number sign, right?

10  A   Yes.

11  Q   And this, the grower's name, was entered in this

12      case, Delbert Bland?

13  A   Yes.

14  Q   And the date of the action was entered there in

15      the upper left-hand corner beside the printed

16      word "date," correct?

17  A   Yes.

18  Q   In this case, April 9, 2004, correct?

19  A   Yes.

20  Q   And then the initials of the person completing

21      the form were entered to the right of the printed

22      word "initials," correct?

23  A   Correct.

24  Q   And that would have been Ms. Carrol Trantanella

Sarah Eury Farrell

1         in this case?

2    A    Yes.

3    Q    And you recognize her initials there?

4    A    I do.

5    Q    And to the right over on the right-hand side

6         there's a handwritten entry there, "posted and

7         e-mailed," April 14 -- April 15, 2004, and looks

8         like the same initials.

9              Do you understand what that means?

10   A    Yeah.  She's saying there, "posted" meaning that

11        she had made the change in the database that was

12        requested, and then she has -- looks like she's

13        e-mailed the change to alert M.O.A. or C.S.I.

14        that, and I think it may have been C.S.I. then, I

15        can't remember when the change occurred, again,

16        but she's alerting them that a change has been

17        made.

18   Q    And the change in this case was adding two

19        replacement workers?

20   A    Yes.

21   Q    And you know that because of the comments which

22        say "add as replacement," correct?

23   A    Correct.

24   Q    And in this case the person requesting the change

Sarah Eury Farrell

1           was Nahum Ornelas; is that correct?

2    A    Yes.

3    Q    And you know that because his name appears

4         handwritten to the right of the printed words

5         "person requesting the change," correct?

6    A    Correct.

7    Q    And the two replacement workers that were

8         involved, you know their names from the entries

9         that appear under the columns W-K and then the

10        printed word "name," correct?

11   A    Correct.

12   Q    And their addresses in this case to the extent we

13        know them is that they resided or lived in

14        Michoacán, the Mexican state of Michoacán,

15        correct?

16   A    Yes.

17   Q    And your know that from the entries there,

18        M-i-c-h, correct?

19   A    Correct.

20   Q    And what is meant by the date there that are --

21        appear to the right of the name Jose Luis

22        Morales?  It's got 5, appears to be May 3, 2004

23        to December 15, 2004?

24   A    I'm guessing that that is the contract period

Sarah Eury Farrell

1          that these workers were to be added to, so it

2          could possibly be their process date at the

3          consolate, 5/3.  It's a start and end date.

4     Q    And are you -- were you aware of any jobs at

5          Bland Farms that had a season lasting seven

6          months?  Or are we talking about both seasons,

7          planting and harvesting, or what's going on here?

8     A    I'm not.

9     Q    You're not aware of having, them having a season

10         lasting seven months?

11    A    They had a one-time application for some type of

12         tobacco work, but I don't know -- I don't recall

13         the contract dates for that.

14    Q    And going back to the first page of the same

15         exhibit, this is a copy of a typewritten message

16         with a postscript from Ms. Trantanella to Nahum

17         Ornelas over at Bland Farms, correct?

18    A    Yes.

19    Q    And the first part of it says, or lists four

20         workers, and then it says that they may not come

21         as their phone number is wrong and correct number

22         still needed, right?

23    A    Yes.

24    Q    And in terms of the phone number being wrong and

Sarah Eury Farrell

1      the correct phone number still needed, first of

2      all, how was it discovered that the phone number

3      was wrong?

4   A   C.S.I. or M.O.A. contacted those workers and

5      found the phone number to be wrong, and then

6      either put that in the comments on the workers'

7      record, or informed Carrol in some way that phone

8      numbers for those individuals were wrong.

9   Q   And then in the following four messages there's

10      various actions taken by a person referred to as

11      an agent.

12          Do you see that?

13   A   Yes.

14   Q   And this person that's referred to as an agent

15      was an agent of which entity or person, as you

16      understand the messages?

17   A   As I understand it, the agent is or was an

18      employee of M.O.A. or C.S.I.

19   Q   And that employee then had either left a message

20      or couldn't find the workers that are indicated

21      there, right?

22   A   Yes.

23   Q   And if a particular agent of this type had

24      difficulty in contacting a particular worker at

Sarah Eury Farrell

1          the telephone number that had been provided, or

2          could not contact even if they left messages at

3          the telephone number that had been provided, was

4          it unusual for I.L.M.C. employees to give

5          feedback of the type that's copied on page 1 of

6          Plaintiff's Exhibit 100 to Mr. Ornelas or another

7          representative to Bland Farms to let them know

8          what was going on?

9     A    It was not unusual.

10    Q    Let me hand you what's been marked as Plaintiff's

11         Exhibit Number 99.

12                   (Plaintiff's Exhibit 99 marked.)

13         BY MR. WILLIS:

14    Q    And the Carrol that's referred to, whose name is

15         referred to up top, that's the Carrol Trantanella

16         that we were talking about earlier?

17    A    Yes.  Looks like I spelled her name wrong, too.

18    Q    The name, like --

19    A    Her last name.

20    Q    Won't be the last time she probably has her name

21         misspelled, unfortunately for her.

22              And there's an indication on this particular

23         copy of an e-mail that it's copied to Theresa

24         Boles.

Sarah Eury Farrell

1              Do you see that?

2    A    Yes, I do.

3    Q    And who, as of May 2003, was Theresa Boles?

4    A    She was an employee of I.L.M.C.

5    Q    And as of that same date, who was Zulma,

6         Z-u-l-m-a, Medellin, M-e-d-e-l-l-i-n?

7    A    She was an employee of M.O.A.

8    Q    In Monterey?

9    A    In Monterey.

10   Q    At their office there?

11   A    Yes.

12   Q    And is she still an employee there at their

13        office in Monterey?

14   A    No, she is not.

15   Q    Did she leave before this year?

16   A    Yes.

17   Q    How many years was she there, more than a year?

18   A    Yes.

19   Q    And the handwriting that appears to the extreme

20        right of the document appears to say, "Call Patsy

21        Friday, May 9, 2003."

22              Do you see that?

23   A    Yes, I do.

24   Q    Do you recognize that handwriting?

Sarah Eury Farrell

1    A    Looks like Carrol's.

2    Q    And assuming that Carrol got this e-mail, or

3         received this e-mail from Ms. Medellin, what

4         reason, if any, would she have to call Patsy

5         about the content of the e-mail?

6    A    Zulma is asking in this e-mail if Bland Farms

7         wishes to employ these people listed here, and so

8         Carrol was going to call Patsy and ask her if

9         Bland Farms wished to employ these folks.

10   Q    And the handwritten entry beside the last name of

11        Martinez, do you see that?  Do you recognize that

12        handwriting?

13   A    Again, it looks like Carrol's.

14   Q    And do you recognize what it says?  Is it, "agent

15        has passport April 10"?

16   A    Yes.

17   Q    And again, the agent we're referring to, that's

18        referred to here, is, to your understanding, an

19        agent of whom, or what entity?

20   A    An agent for M.O.A.

21   Q    And would this be a person who was employed in

22        the M.O.A. Monterey office, or what?

23   A    No, this would have been a person that was out in

24        a state in Mexico, somewhere inside of Mexico.

Sarah Eury Farrell

1   Q   And do you recognize generally the Plaintiff's

2       Exhibit 99 as a copy of an e-mail from Zulma

3       Medellin over at M.O.A. in Monterey, to Carrol

4       Trantanella of your office, I.L.M.C., of May 8,

5       2003?

6   A   Yes.

7   Q   Let me hand you what's been marked as Plaintiff's

8       Exhibit 24 and direct your attention to page 10

9       of that same exhibit.

10              (Plaintiff's Exhibit 24 marked.)

11      BY MR. WILLIS:

12  Q   You're at page 10, should be a printed 10 up

13      there?  Yeah, there you go.

14  A   Okay.

15  Q   And this is another form that was used by

16      I.L.M.C. in 2005, right?

17  A   Yes.

18  Q   And it's been slightly modified from the form

19      that we looked at from 2004, right?

20  A   Yes.

21  Q   And it has an entry on it for when information

22      was, according to the printed statement, e-mailed

23      to C.S.I., correct?

24  A   Correct.

Sarah Eury Farrell

1    Q    And in this case the date that the e-mail was

2         sent, according to the record, was March 15,

3         2005, correct?

4    A    Correct.

5    Q    And the person who did it was Jenee Schieler,

6         J-e-n-e-e S-h -- no, S-c-h-i-e-l-e-r, right?

7    A    Yes.

8    Q    And she also posted on the system, according to

9         the printed words there, on that same date,

10        correct?

11   A    Correct.

12   Q    And when one, according to the records of this

13        type that were used by I.L.M.C. in 2005, posted

14        information on the system, we're talking about,

15        again, entering information into the database,

16        right?

17   A    Correct.

18   Q    And it is the person who made the posting and did

19        the e-mailing, we know who that person is from

20        the initials beside the printed word "initials,"

21        correct?

22   A    Correct.

23   Q    And the date she completed the record was on

24        March 15, 2005, and we know that from the date

Sarah Eury Farrell

1      that appears to the right of the printed word

2      "date," correct?

3   A   That there, that date, that specific entry notes

4      the date that the individual called in and asked

5      to make the change or addition.

6   Q   And so that would be the date that Ms. Schieler

7      spoke to a person that she refers to as Nom,

8      N-o-m, correct?

9   A   Correct.

10  Q   And we know that because the name N-o-m appears

11     to the right of the printed words "spoke to,"

12     correct?

13  A   Correct.

14  Q   And Nom here is Ms. Schieler's way of referring

15     to Nahum, N-a-h-u-m, Ornelas, right?

16  A   Right.

17  Q   And at least for the first four workers whose

18     written names, handwritten names appear on this

19     form, their names were removed from the preferred

20     list of workers to come for Bland Farms because

21     they were not going north, so to speak, or at

22     least not going north of Mr. Bland in 2005,

23     correct?

24  A   No go this year, yes, correct.

Sarah Eury Farrell

1   Q   And we know that because we've got the

2       abbreviation, or acronym there, N.G.Y. not 5, or

3       0-5, removed, with the word "removed" under

4       all -- all in handwritten form?

5   A   Correct.

6   Q   With the brackets around those four names?

7   A   Correct.

8   Q   Then there was a worker added, at least one,

9       worker number 513034, for the onion harvesting

10      season from April 8th, 2005 to May 27, 2005, and

11      we know that because of the handwritten entry

12      that says "add" and then has a worker name,

13      513034, and the worker's name, correct?

14  A   Correct.

15  Q   And then there under the comments column there,

16      there's a printed word "comments," there appears

17      to be some other workers listed there whose names

18      are handwritten in.

19          Can you tell me what's happening with those

20      workers based on what's written on the form?

21  A   It looks like Bland Farms wanted to add those

22      workers to the list.

23  Q   And in this case Ms. Schieler, at least according

24      to the form, says she spoke to Nahum Ornelas,

Sarah Eury Farrell

1          right?

2    A     Yes.

3    Q     Were forms of this type used in 2005 to document

4          oral, o-r-a-l, communications with client's

5          representatives like Mr. Ornelas when it came to

6          adding or removing workers on their preferred

7          list?

8    A     Yes.

9    Q     And obviously you had a different system if it

10         came in writing from the clients, right?

11   A     Yes.

12   Q     What sort of system was used there?  Was it just

13         entered into the database then from the writing?

14   A     Yes.

15   Q     And when it came orally, o-r-a-l-l-y, from the

16         client, then there was this intermediate use --

17         intermediate step of -- which called for the use

18         of a form like the one we have here copied at

19         page 10 of Plaintiff's Exhibit 24?

20   A     Correct.

21   Q     Let me hand you what's been marked as Plaintiff's

22         Exhibit number 102.

23              (Plaintiff's Exhibit 102 marked.)

24

Sarah Eury Farrell

1      BY MR. WILLIS:

2   Q   Document on page 1 there's an entry that reads in

3       handwritten form, as best as I can read it,

4       "posted all new replace," appears something's

5       been cut off, "for April 1, 2003."  Looks like

6       Ms. Trantanella, if I've got her name pronounced

7       correctly, Trantanella's initials, correct?

8   A   Correct.

9   Q   And is that what it appears to be, to be also,

10      posted all new replacement workers 4/1/03, signed

11      by or initialed by Ms. Trantanella?

12  A   That's -- that's how it reads, yeah.

13  Q   And then from that entry in her handwriting

14      beside the list of names that appear here, do you

15      understand the document to indicate that the

16      workers listed there were all new replacement

17      workers, and she then posted them after she

18      received the list from Patsy, whose name appears

19      up at the fax Post-It note at the top?

20  A   It appears that way, yes.

21  Q   There's a separate document here on the next page

22      from Patsy to somebody dated June 2, 2003.

23          Do you see that?

24  A   Yes.

Sarah Eury Farrell

1   Q   And it indicates that a number of workers left
2       before their contract ended, or did not get on
3       the buses, right?
4   A   Yes.
5   Q   Now, the buses we're talking about are what
6       buses, as you understand the document here?
7   A   That would be the bus that Bland chartered to
8       send their workers home at the end of the
9       contract.
10  Q   And the leaving before the contract ended means
11      what, as you understand the document?
12  A   Exactly what it says, basically, just that
13      they're informing us that those workers left
14      before the contract ended.
15  Q   So if the contract period to harvest onions were
16      from early April to the middle of May, they left
17      before the middle of May?
18  A   Yes.
19  Q   I'm going to hand you what's been marked as
20      Plaintiff's Exhibit 103.
21              (Plaintiff's Exhibit 103 marked.)
22          THE WITNESS:  Bob, excuse me, I'm going to
23      go over there and get a tissue.
24

Sarah Eury Farrell

| 1 | | BY MR. WILLIS: |
|---|---|---|
| 2 | Q | Right, no problem.  Are you okay? |
| 3 | A | Yeah.  Yeah, I just... |
| 4 | Q | If you need to get another one, just tell me and |
| 5 | | we'll take a break for a second. |
| 6 | | Let me direct your attention to page 4 of |
| 7 | | the same exhibit.  This is a copy of the fax that |
| 8 | | you sent to Patsy Hutcherson at Bland Farms on |
| 9 | | April 6, 2005, right? |
| 10 | A | Correct. |
| 11 | Q | And in the text of the fax at page 4 of this |
| 12 | | exhibit there is a number of -- well, there's an |
| 13 | | index basically that explains several entries |
| 14 | | there starting with N-G-Y in capital letters, |
| 15 | | meeting with agent. |
| 16 | | Do you see that?  Or meeting with -- meeting |
| 17 | | W slash agent.  Do you see that? |
| 18 | A | Yes. |
| 19 | Q | And going on down there, at any point in your |
| 20 | | communications with Patsy Hutcherson, in 2005 or |
| 21 | | before 2005, did you ever receive any inquiry |
| 22 | | from her as to what was meant by the use of the |
| 23 | | statement or acronym N-G-Y? |
| 24 | A | There may have been, but I don't recall. |

Sarah Eury Farrell

1   Q   Same question with respect to meeting with agent.

2   A   Again, there may have been, but I don't recall.

3   Q   And same question with respect to the use of the

4       phrase "re-contacting."

5   A   There may have been, but I don't recall.

6   Q   And how about with respect to the use of the

7       phrase "ready to go"?

8   A   There may have been, but I do not recall.

9   Q   And how about with respect to the use of the

10      phrase "just added" as used in conjunction with

11      workers?

12   A   There may have been, but I don't recall.

13   Q   So with respect to all the entries here when used

14      in connection with a worker coming to Bland Farms

15      under the H-2A program, there may have been

16      communications with Ms. Hutcherson, but you don't

17      recall?

18   A   Correct.

19   Q   When you were dealing with Ms. Hutcherson, was it

20      your impression that she acted only as a conduit

21      for information from Nahum Ornelas and had no

22      understanding of what she was doing?

23         MR. DILLARD:  Object to the extent that it's

24      going to cause the witness to speculate.

Sarah Eury Farrell

1      BY MR. WILLIS:

2   Q   I'm asking for your impression of what was going

3       on, that she acted only as a conduit of

4       information for Nahum Ornelas and never had any

5       idea what was happening with respect to the

6       communications that she was involved in?

7   A   I think Patsy had an idea of what --

8                  (Interruption at the door.)

9      BY MR. WILLIS:

10  Q   She had an idea of what?

11  A   I think she was more than a conduit, but I'm not

12      exactly sure what the depth of her understanding

13      was.

14  Q   Let me direct your attention back to Plaintiff's

15      Exhibit 106, which is the notice of deposition.

16          And direct your attention to the areas of

17      designation which are marked as paragraphs 15 and

18      16 of that exhibit.

19          In paragraph 15, basically asks I.L.M.C. to

20      designate a person to testify as to the person or

21      business entity who made the decision to use,

22      employ or contract with M.O.A. or C.S.I. to

23      provide any services or assistance of any kind to

24      any worker to be employed by Bland Farms under

Sarah Eury Farrell

1          the H-2A program.

2               Do you see that?

3   A     Yes.

4   Q     In the time period from 1 August, '01 through 31

5         December, '07, right?

6   A     Yes.

7   Q     And then paragraph 16 for that same time period

8         asks I.L.M.C. to designate a person to testify on

9         its behalf with respect to I.L.M.C.'s knowledge

10        as to the terms and conditions of any agreement

11        to use, employ, or contract with M.O.A. or C.S.I.

12        to provide those same type of services, right?

13  A     Right.

14  Q     Now, let me direct your attention, if I may, to

15        Plaintiff's Exhibit 62, and I believe it's the

16        third page, if I'm not mistaken, that's got the

17        agency agreement on it.

18             And I believe I already asked you a question

19        about that in the deposition that we finished of

20        you individually on December 17, 2008 at page

21        118, and I'll just hand you that to refresh your

22        recollection.

23             It's got page 118, if you want to read that

24        silently to yourself.

Sarah Eury Farrell

1        MR. DILLARD:  Just look over your shoulder.

2     BY MR. WILLIS:

3   Q   After you've had a chance to look at page 118 to

4       your satisfaction, if you'll let me know by

5       saying "yes," and also page 119, to the extent

6       that it concerns Exhibit 62.

7   A   Okay.

8   Q   If I could have that back?

9   A   Yes.

10  Q   Now, Plaintiff's Exhibit -- excuse me, the

11      deposition of you on, that we finally finished on

12      December 17 of 2008, was of you individually,

13      right?

14  A   Yes, it was.

15  Q   And now you're testifying on behalf of the

16      corporation I.L.M.C.

17          Do you understand that, right?

18  A   Yes.

19  Q   And what -- and you were not around in 2002?

20  A   I was not.

21  Q   But as the designee of the corporation with

22      respect to areas 15 and 16 in terms of who was

23      making the decisions and what decisions were made

24      in terms of using or employing or contracting

Sarah Eury Farrell

1      with M.O.A. or C.S.I. in 2002, was the decision

2      made in 2002 by I.L.M.C. to also designate M.O.A.

3      as its representative pursuant to that paragraph

4      3(a) in the agency agreement that you testified

5      to at page 118 of your deposition on December 18,

6      excuse me, December 17?

7           Basically I'm just asking was it the same

8      decision made in 2002 that was made after you

9      came along that you had personal knowledge in

10     '03?

11  A  I think it was, but because I wasn't there, I

12     don't know what --

13  Q  Right, but in terms --

14  A  -- considerations were made.

15  Q  But in terms of whatever considerations were

16     made, as far as the designation of M.O.A., the

17     same designation was made in '02 that you know

18     personally was made in '03, based on what you

19     know from talking to other people in I.L.M.C.?

20  A  Yes.

21  Q  Now, let's go to the documents that were

22     protracted in screens.  We'll start with

23     Plaintiff's Exhibit 110.

24           MR. LOFTIS:  Since we're switching to

Sarah Eury Farrell

1      another area, can we just take a short break?

2           MR. WILLIS:   Not a problem.

3                (Recess taken from 3:11 p.m. to 3:17

4           p.m.)

5      BY MR. WILLIS:

6   Q   Plaintiff's Exhibit 110, the first page there,

7      there is a little, in the, about the middle of

8      the worker tracking screen -- or first of all,

9      let me ask you, these are copies that I'm talking

10     about, "these" meaning all the pages in

11     Plaintiff's Exhibits 110, are copies of computer

12     screens from the database used to track worker

13     referrals and placements by I.L.M.C. in 2002,

14     correct?

15  A   Correct.

16  Q   And the information that appears on them was

17     entered by a person with knowledge at the time

18     they made the entries as part of regularly

19     conducted business activity of I.L.M.C., correct?

20  A   I.L.M.C. staff inputted some of them and N.C.G.A.

21     staff inputted some of the information on these

22     pages as well.

23  Q   And so is information that was collected and

24     input into this database for which this screen

Sarah Eury Farrell

1       was printed, or from which this screen was

2       printed by persons employed by I.L.M.C. or

3       N.C.G.A. at the time when they entered it, they

4       had personal knowledge or had knowledge of the

5       information they were inputting?

6  A   Yes.

7  Q   And it was kept by them, either by I.L.M.C. or

8       N.C.G.A., as part of regularly conducted business

9       activity --

10  A   Correct.

11  Q   -- of those companies?

12  A   Correct.

13  Q   And that would be the same for the worker

14       tracking screens that appear in, copied in

15       Plaintiff's Exhibit 111?

16  A   Correct.

17  Q   Now, going back to the first page of Plaintiff's

18       Exhibit 110, there are a bunch of boxes that have

19       entry, or little spaces, looks like for a toggle

20       switch, either a check or no check at all, for

21       things that's called "NoGo," "Reject," "New," "No

22       Show," "Departed," "PP," capital letters, in

23       "MTY."

24          Do you see that?

Sarah Eury Farrell

1    A    Yes, I do.

2    Q    Now, the, if a check appears in the, beside the

3         printed words NoGo, that means or meant that the

4         worker was not coming to work with Bland Farms or

5         N.C.G.A. in whatever year was involved, right?

6    A    Right.

7    Q    Or whatever season was involved?

8    A    Correct.

9    Q    And if the check was entered to the right of the

10        box, or to the right of the printed word

11        "Reject," that indicated what?

12   A    That the worker had been rejected by the U.S.

13        Consolate.

14   Q    And if the check mark was entered to the right of

15        the printed word "New," what did that mean?

16   A    That it was a new worker that had been recruited

17        by M.O.A. or C.S.I.

18   Q    So, for example, with respect to this particular

19        worker at page 1 of Plaintiff's Exhibit 110, the

20        worker Adrian, A-d-r-i-a-n, Vega, V-e-g-a, Soto,

21        S-o-t-o, was a new worker who had never worked

22        with N.C.G.A. before?

23            And when I say N.C.G.A., I'm talking about

24        the North Carolina Growers Association?

Sarah Eury Farrell

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And did it also mean that the worker was a new |
| 3 | | worker who had never worked, at least before |
| 4 | | November 11, 2002, with Delbert Bland? |
| 5 | A | Yes. |
| 6 | Q | So in this case then Delbert Bland was the |
| 7 | | beneficiary of recruiting activities by Manpower |
| 8 | | of the Americas? |
| 9 | A | It appears that way. |
| 10 | | MR. DILLARD:  Objection. |
| 11 | | THE WITNESS:  Based on what the check box |
| 12 | | was supposed to mean. |
| 13 | | BY MR. WILLIS: |
| 14 | Q | And what -- and when you've got down here at the |
| 15 | | bottom of the computer screen where it's got the |
| 16 | | words "In," "Out," do you see those printed in |
| 17 | | the unshaded portion, and then to the right of |
| 18 | | the word "In," in the column headed by the words |
| 19 | | "Okay to print," there's a check, and to the left |
| 20 | | of that on the same line there's an amount of |
| 21 | | 162?  What's that mean? |
| 22 | A | That is N.C.G.A. information. |
| 23 | Q | Meaning what? |
| 24 | A | Meaning that that is data that an N.C.G.A. staff |

Sarah Eury Farrell

1       member entered.

2    Q  And data meaning that a check was written to this

3       particular worker in the amount of $162 on August

4       19, 2002?

5    A  My basic understanding of it is yes.  But those

6       notes concern the payment reimbursement of

7       inbound and outbound transportation.

8    Q  And the outbound transportation is for the

9       payment for that is reflected in the line that

10      has the word "Out," in the "in/out" column there?

11   A  Yes, I think so.

12   Q  With a date October 24, 2002 under the column

13      "date paid," correct?

14   A  Yes.

15   Q  Now, in the comments column, or actually it's not

16      a column but in the comments space where you see

17      that date 9 slash 26, do you see that?

18   A  Yes.

19   Q  Could you explain what that means, if you have

20      any understanding, all the words that are written

21      there?

22   A  I wouldn't have any understanding of that beyond

23      what I'm reading along with you.

24   Q  And why does the word "onions" appear in there?